Mr. Mazel, I note that not only are you the lawyer in this case, but you also are the – I don't know if you own Jatera, but you're an officer in Jatera. Yes, Your Honor, I'm a principal in the company. And apparently you suggested to Ms. Wooten that she ought to file this action, according to her deposition. That's correct. And so do you go around looking for acceleration claims that you can pursue? I mean, is that your specialty? No, Your Honor. Bank acceleration? Pardon me? I say, is that your specialty, going around looking for bank acceleration cases you can handle? No, Your Honor. My specialty is in civil litigation, and the mechanism by which Ms. Wooten came into contact with me was – Well, you don't need to tell me that. I'm just looking at what's in the deposition.  Very well, Your Honor. Jumping to the issues before the Court, and I think it's important, since the question was asked, that the issue about my position as a principal, oh, it's only a logical position, because in cases of this nature and for a price point on this particular House, there really is no strong economic reason why Ms. Wooten would, on her own, bring this lawsuit, because the attorney's fees are not recoverable. And so I think it is logical that a situation where I was involved would advance this particular matter for this Court from an economic standpoint. But I want to jump to the issue – Who is this Mr. Horn? He signed the affidavit as president of Jaterra, but I understand he's not listed as an officer with Jaterra. Who is Mr. Horn? Mr. Horn is an officer of the company. All right. The first issue that we are addressing here, the legal issue that we're addressing here, is the issue of the statute of frauds and how the trial court treated this particular issue. There were two, obviously, competing summary judgments that were applied. Are you completely convinced that the statute of frauds was the basis for the district court's – one of the bases for the district court's opinion? It was the basis. I certainly could be in error. I sort of read the opinion differently, but. I respect the court's position, or the justice's position on the case, but in the record 101050 of the opinion, as well as 1051, the court states, thus, to the extent the purported agreement exists between Ms. Wooten and Jaterra, it is not in writing, and therefore, it is barred by the statute of frauds. So in reading the opinion, the court rendered the alleged verbal agreement as one – or the perceived verbal agreement as violating the statute of frauds. And so the court never reached the issue of the detrimental reliance by Ms. Wooten. They never did. He never – the court never did, simply because of the fact that the statute of frauds eliminated her interest in the particular matter. In fact, the evidence that was supplied by – in response to the defendant's motion for summary judgment demonstrated that there was a contingent reversionary interest by Ms. Wooten. And that evidence – Can you recall what it was? Well, it had been years since that particular instance, and when she was – she was asked in what is part of the record is, is she knew she didn't gift the property, but she knew that she was going to receive something in – in furtherance of that. So she didn't gift the property, but she deeded the property, which thereby further buttresses this particular evidence to demonstrate that, indeed, there was a contingent reversionary interest. But when the Court ruled that – that, therefore, the statute of frauds barred even consideration of that particular argument – Remind me of the page again where the Court ruled that it barred it. Page – in the record, 1051. The troubling aspect of this particular Court's exercise of the statute of fraud is, is that – Well, isn't that – isn't that the Court's – I suppose you could say that the Court is saying, you know, this oral agreement that Ms. Wooten can't remember, but Mr. Horn signed in his affidavit that this took place. Perhaps that's in the form of the Court's discretion to admit evidence. Maybe – maybe the reference is really to the fact that I'm not going to consider this as evidence, just like, you know, it's hearsay or something along that lines. Have you – Well, certainly the Court is empowered to make a ruling to that effect, but I did not read the Court's ruling that essentially sets forth that position. If the Court – Well, he says the Court finds Mr. Horn's averiment merely amounts to an assertion that Ms. Wooten's interest in the property is evidenced by an unenforceable agreement. Such evidence is insufficient to rebut defendants showing that Ms. Wooten had – has no interest in the property. Now, he didn't say it's not admissible, I agree, but I'm just not sure his statute – the statute of frauds has the force that you attribute to it. Well, I think – I think the basis – I think you could review that particular statement in a multiplicity of ways if the Court determines that based on the statute of frauds it's an unenforceable agreement, and based on the statute of fraud that it should – that information should be barred. It could conclude that it was merely an averiment, an allegation, and not consider that particular statement. But irrespective – I'm sorry, Judge, Justice. The alternative, he says, in addition to – at page – at record 1051 – in addition to the evidence before the Court, it is worth noting that Mrs. Wooten seeks to quiet title in Jotira's name, not in her own name, and then he cites to some authority, says the record before the Court shows that she transferred her interest in the property to S-C-O-J-O. Plaintiff's evidence, including the Horn Declaration, fails to create a genuine issue of material fact. That's why I'm a little – that's why I think it's an open question how the effect of this statute of frauds ruling. Well, I don't see how – if the Court actually – so on – one of the things that I can't understand is that the Court was saying that this was insufficient evidence not based on on what basis does the Court, the trial court, rule that it is insufficient? I can't see how it is. The clear meaning of the affidavit is, is this is the transaction that was done and this is the contingent reversionary interest that he stated. The only basis under which I think that a trial court can say that it is not going to consider the affidavit testimony is if it directly contradicts previous testimonies. The only legal basis I know where it can simply disregard. But in the facts that were being averred – or, excuse me, stated in the affidavit were not conclusory statements. So if the Court has a basis for disregarding that evidence, I don't know if the Court clearly enunciated the basis of that particular decision. And so for that reason, we move back to the issue of statute of frauds. And even if that were the case, why the discussion about the statute of frauds? If it was going – if the Court was going to disregard that particular evidence, why have a discussion about the statute of frauds? Why not just jump to the issue of the evidence? And for that reason, I think that's the basis of the reason for the Court ruling as it did on the statute of frauds. But troubling as it may be, statute of frauds came into play in the Court's analysis some way, somehow, and without which it is questionable whether the Court would have ruled or should have ruled as it did. What evidence is there in the record that Ms. Wooten detrimentally relied on the 2010 acceleration? Her affidavit states that – and what's kind of complete or replete in the record is, is that she tried – excuse me, she received the acceleration notice. She tried to work out an arrangement to extend or to renegotiate or recast her note. And the bank was well within its right to refuse to do so, okay? But the bank, because it's a home equity loan, filed a lawsuit to receive an order to permit it – permit the bank to foreclose. The bank's lawyer made it very clear they were going to move foreclosure. And after she signed off on the agreed order for giving the court – excuse me, giving the bank permission to foreclose, she moved out. And the affidavit testimony makes it very clear that she relied upon the acceleration notice and the bank's position that it was moving forward with foreclosure. Was she obligated to move out? No, she was not obligated to move out. There was no foreclosure and there's never been a foreclosure. And there's never been an eviction case. But she moved out because of the position that the bank was taking. Well, she moved out several months later. And I'm looking here for the date. Just one second. It was like four or five months later, wasn't it? I don't remember. I believe it was in – Right. She signed a final judgment in November 2011 consenting to foreclosure. The action was filed in 2011. The notice to accelerate was in March of 2010. And after she signed that, she moved out in January of 2012. She signed the final judgment in November 2011 and moved in January 2012. I believe the order was entered in December. So she moved 30 to 60 days after all of that transpired. And what was important is in that affidavit is in the entire course, she was still trying to work with the lender, but the lender just wasn't willing to work and they wanted to move forward with foreclosure. Now, if you say that affidavit, are you referring to Horn's affidavit or Ms. Wooten's affidavit? Ms. Wooten's affidavit. Does Texas law recognize this detrimental reliance? I beg your pardon? Does Texas law recognize this detrimental reliance? Yes, it does. How? How? Well. How do you get past 16038? Well, first off, 16.038 doesn't apply in this particular situation because at the time it was enacted, it only applied if the statute of limitation hadn't already run. Well, when that statute was enacted, the statute of limitation had already run based upon the acceleration notice in 2010. And so even still, our response in regard to that is, is that there's two exceptions that have been recognized under the common law. One is the detrimental reliance and the other is an objection. 16.038 doesn't even speak to either one of those exceptions. Are those doctrines even really in Texas law? I mean, as I understand it, you're relying on this Texarkana case. Well, there — this circuit has recognized that particular detrimental reliance exception. In fact, in 2016, the Bitterroot case analyzed the issue of whether or not detrimental reliance — there was sufficient evidence of detrimental reliance. So — Has any court ever granted relief on this detrimental reliance theory under Texas law? I know there's dicta in more than one case, I'll grant you the dicta, but it is, to me, somewhat of a surprising theory. I'm just curious if there's actual solid Texas law saying, yes, we are recognizing this and we're granting relief based on it. There's over 20 cases, Federal and State, that recite this detrimental reliance exception. And if we really think about it, Judge Ho — What do you mean, recite? They — Do they base a holding on it? They recognize, they identify the particular State law that identifies the two exceptions. And numerous cases have analyzed the issue and dealt with the issue of detrimental reliance, but none have found in favor of — have found sufficient evidence to demonstrate detrimental reliance. So there is a distinction. There are many cases that have analyzed the issue of detrimental reliance, but none have said you've supplied sufficient evidence. And — So it's never been — it's been discussed, it's been contemplated, it's been debated. We've — we've talked about its existence in the discussion, but you don't have a case then that actually grants relief and, therefore, codifies it, even as a matter of a lower court in Texas, let alone the Texas Supreme Court? No. I think — I think many cases have caught — you know, codified it. In the sense that you're suggesting, have codified it, but none have, in examination of the facts, found that it was supportive. Well, would you be — I'm sorry. Go ahead, sir. What would you think of certifying that question to the Texas Supreme Court if you think that it is in fact a solid part of Texas law? Because I'm not convinced that it is Texas law. Okay. But certainly, we're not the Texas Supreme Court. What is your view on certification? I have no objection to it. But what I will say is this. If we really think about the bedrock of equity, right, when we think of the two pillars of the law, equity and the law, the concept of detrimental reliance is well established. It makes perfect sense. I mean, when you think of a normal contract with two parties, and one party has an option to exercise something in the future, and that party exercises that option — let's take mortgages out of the picture. Let's just call it contracts. Exercises that option. The other party to the contract detrimentally relies upon that exercise. The exercising party can't just circle back and say, eh, I've changed my mind. That is a common, distinct principle, detrimental reliance, that is interweaved through our entire jurisprudence. So it being an exception to this particular situation is completely understandable and reasonable and makes common sense. As I understand it, in this case, you've got the lender making an offer. There's already been a failure to pay. There's an offer to essentially settle at one price point. Is the idea that you can detrimentally rely on the assumption that that's the best and final offer and a better offer is not coming later, that's what strikes me as sort of a weird aspect of this theory. I'm sorry. I don't quite follow your point. Do I understand this theory to be, I thought this was your best and final offer, sort of an offer to settle, if you will, is sort of how I think of it, and therefore I moved out. I was not assuming that you were going to come back and give me an even better offer to settle later. No. I think the detrimental reliance goes back to the issue that at all times in the lawsuit that was filed by the bank to get foreclosure, they were unwavering in the fact that they were going to pursue foreclosure based on the 2010 acceleration notice. And when they were unwavering in the fact, she presumed that they were not going to not relent, and she moved out, based upon her reliance on the acceleration notice and the bank's position moving forward. Right. Does that make sense? Yes. No, it does make sense. The bank comes back after the first acceleration and says, you know what? We're going to give you another offer. It's an even better offer than before. And so I guess to my mind, how do we know that Texas law says you get to count on the assumption that the first offer wasn't necessarily the best and final offer, that a better offer was coming? So what you're speaking of is, I guess — She's already breached. Eleven months later, they came back and sent a notice saying, we will accept less than all of the principal amount plus the arrearages. Certainly, they can do that. But my client couldn't — I don't think that necessarily unwinds the detrimental reliance. If she's already moved on and incurred expenses in connection when she's moved out and all the other evidence is presented, then at that point, it becomes kind of her option, if we think about it. Right? Because even if someone exercises an option and then someone detrimentally relies upon that, and then they say they want to unwind that option, then it's the party over here who detrimentally relied has the opportunity to say okay or no. Moved back into the house. Pardon? And she could have moved back into her home. Yes. All right. Thank you. Thank you. So you've saved time for rebuttal. Mr. Hanson. Thank you, Your Honors. Tom Hanson on behalf of the Appellees. I think I would start where Judge Ho was discussing and the question of whether there is a detrimental reliance exception to the lender's unilateral right to abandon acceleration. I'm not the Texas Supreme Court. You're not the Texas Supreme Court. We don't know how that court would resolve it. Your question is interesting, Judge Ho, as to certification. I think in the appropriate case, certification would be the right move. I think in this case, when there are so many other bases for affirming the district court's judgment, I think it's probably not the right move in this case. But certainly, I'd like that question answered. I personally have obviously been advocating that there is no exception. I've gotten a number of courts in the trial court level to at least agree that it's a question. I'm assuming this is a frequently recurring issue. Well, and it is. And it's sort of more recently because when this Court decided Boren and other courts in the building that a notice of default that sought less than the total amount due did constitute abandonment of acceleration, borrower's counsel fought against... That's what the legislature has said. And that's right. And to Mr. Mazel's answer to your question about 1603A of the Civil Practices and Remedies Code, he says, well, it also doesn't talk about the fact that the borrower can object. And my response to that is, that's right. It doesn't. And that's because the legislature has said, if you accelerate and then you send the 1603A notice, it doesn't matter if the borrower objects. I think I heard correctly from opposing counsel, the legislature passed this against the backdrop of no contrary court, at least in terms of actually granting the theory. They're speculating about the theory. They think it might exist. But they never actually come full-throated. That's exactly correct, Your Honor. And the reason that this has become a bigger issue lately is because borrower's counsel, like Mr. Mazel, are trying new theories. Now, the Boren has been widely accepted, not just by the federal courts in Texas, but also by, I think there's seven or eight now published Texas Court of Appeals opinions that have adopted Boren's reasoning, and essentially, and also 1603A. So it's, you know, it's a new theory. We've seen a lot of these types of arguments in the last few years. But what's true is that no court has ever adopted it and applied it. You know, a maxim of statutory construction is, consistent with the discussion you've had, the colloquy you've had with Judge Ho, is that we assume when a statute is passed, like 1603A, the legislature is aware of what's going on in this field, and if it had intended detrimental reliance to be an exception, it would be in the statute. And, you know, the idea that we'll have courts amending these state statutes, you've got to have a lot of bases for doing that. And that doesn't appear to be the case in this instance. I believe, Your Honor, that the legislature is charged with knowledge of the law when it enacts a statute, and we cited the case in our brief on the maxim of statutory construction, that the legislature is presumed to know what the courts have said. And I didn't delve into the legislative history of 1603A in this case, but it certainly was a statute that was proffered and enacted specifically to try and deal with all of these abandonment and statute of limitations type arguments that were being advanced by the borrower's bar. So, in my mind, I think that maximum cuts in my favor, because I think it shows that the legislature was aware of what the courts were doing and what they were saying, and specifically declined not to adopt the exception that's been repeated like a mantra in dicta for 20 years, but never applied. So that's sort of my position on the detrimental reliance exception and whether it exists or not. Obviously, we cited the number of cases that have sort of questioned its existence. I think those cases are important not only for that point, but also for the case where you basically say, well, we're not sure if there's a detrimental reliance exception, but let's assume there is. The evidence in front of us isn't it. And those types of cases have included plaintiffs or borrowers. I think you pretty well covered that. So why don't you tell us what is there or is there not in this record that would indicate detrimental reliance? There's nothing, Your Honor. There's an affidavit from ---- Well, tell us what, obviously you would take that position, but tell us what's in the record that would indicate to us affirmatively that there is not detrimental reliance. Affirmatively that there's not detrimental reliance. All right. I'll see if I can do that. So what there is is some vague assertions from Ms. Wooten that she moved out of her house because of the acceleration. That's in the affidavit. And I think it was Judge Barseel correctly pointed out she moved out actually almost two full years after the acceleration notice came out. The acceleration was March of 2010. The move out was January of 2012. So right there, just temporally, the notion that she moved out in reliance on the acceleration I think is a little bit faulty. But then you look at her deposition and we asked her, you know, why did you move out of her house? She didn't say I moved out because the bank had accelerated. She said I moved out because I couldn't pay my mortgage. And that's why a lot of people move out of their house. A lot of people throw their keys in the door and say, let the bank have it. Or people, when they can't pay their mortgage, you know, death in the family, divorce, business went under, lost a job, they sell their house. And they vacate their property. That's what people do when they can't make their mortgage payments. That's what Ms. Wooten did is she moved out of her house and she moved into a senior living facility. Now, there's some very vague assertions in the affidavit of how this was a really bad place. The evidence in the record shows this was actually a pretty nice place. This was a senior living facility in a gated community surrounded by a nature preserve with a movie theater, a swimming pool, a salon, a spa, a fitness room. It was not a row house that she was forced to move into. And putting that aside, Bitterroot, this court's opinion in Bitterroot has already said that just moving out is not sufficient to constitute detrimental reliance under this exception. So what Mr. Mazel, who's obviously aware of that case, has tried to do is try to dress it up by saying, well, she had to sign a lease. And she was personally obligated on the lease. And to me, and I think this is perfectly in line with the cases that we cited in our brief, that just means you owed money for housing before and you owe money for housing now. The only difference is you actually feel like you have to pay it now. And that's not detrimental reliance. That's simply finally agreeing to live up to your housing obligations. And it's the same context of the people who thought that they were going to have to move out and so they went out and in one case, the Erickson case, they actually secured permits and financing for building a second home. And Judge Sparks in that case said, no, that's not detrimental reliance. That's paying money for your housing. And that's what we have evidence of here. And I submit that the case law is very clear and I think just as a matter of common sense, that's not detrimental reliance that somebody would be expected to pay for their housing. And even after the second offer, the $38,000 offer, she still didn't move back. Is that right? That's true. Yes, that's correct. Yeah, she had moved out. The subsequent notice of default went out in, I think it was September of 2012, if I remember correctly. And there was no response since then. There was then another 736 action that was filed. That one was dismissed. And then finally another one which led to the filing of this lawsuit. So, in late 2012, when she got the $38,000 second offer, she didn't move back in. That is correct. Is there any reason to think that had she known that offer was coming back in, what, 2010, that she would have stayed and looked forward to that offer two years later? I don't know that there's a way to answer that. I don't think there's anything in the record that would reveal that, or that she was asked that sort of specific question in her deposition. At any rate, so I think the point stands that there's no evidence that has been submitted, and it's clearly their burden to show the detrimental reliance. That evidence is found wanting, and in fact the evidence suggests that she probably ended up in a pretty good place following her move out. The next there's two additional bases for affirming the district court's judgment beyond the detrimental reliance doesn't exist, and number two, even if it does, they didn't submit evidence of it. The first of those is Jeterra, speaking specifically to Jeterra. That plaintiff did not submit any evidence that it detrimentally relied on anything, and the district court very clearly found, and I think correctly found, that a party that is asserting detrimental reliance has to be the party that did the detrimental relying, if you will. Jeterra did not do anything to change its position. In fact, the only thing it's done with respect to this case is acquire the property, not from Ms. Wooten, but from this non-party SCOJO, which is another entity also controlled by Mr. Horn and Mr. Maisel. And there's no evidence in the record as to what constituted that transaction other than a deed conveying the property from SCOJO to Jeterra, but that's Jeterra's only position change in this case, is it came into ownership of this property. And Mr. Maisel in his reply brief, and I guess in his opening brief as well, tried to make this sort of argument that the trial court wrongly found that they couldn't, that Ms. Wooten couldn't assign a claim or assign a right because it was a personal right. And I went back and read the district court's opinion, and that's not at all what the district court held. The district court cited the very cases that they cited, the Vessels case, the Sandell case, which are sort of canon law in Texas on detrimental reliance, and said a party asserting detrimental reliance has to provide evidence that he or it or she detrimentally relied. Jeterra did not, so Jeterra should not recover anything in this action. And then as to Ms. Wooten, and it's kind of funny that Mr. Maisel started with the statute of frauds because as to Ms. Wooten, the court found she had no interest in the property, and I think, Judge Barksdale, I read the district court's opinion exactly as you did, which is the court wasn't making some ruling that was going to be binding on Ms. Wooten or Jeterra or Scojo if they all decide to sue each other for breach of warranty of title or for failure to perform some amorphous agreement that Ms. Wooten doesn't even remember the terms of. The court was simply saying, this is the only evidence I have in front of me. I have a three-sentence, one-paragraph description of a contract which in very, I would say, non-specific terms talks about a potential conveyance of the property back to Ms. Wooten. And I think when you were talking with Mr. Maisel about this, and the question was whether the district court had simply made an evidentiary ruling or not, if you look on page 1052 of the record, and it's just a little bit further down from where you were reading, but the court says, because plaintiffs have failed to show that Ms. Wooten has an interest in the property. And that's exactly what we objected to. We filed objections in the district court, and we said this is not competent summary judgment evidence. And the district court very clearly said, we agree, or I agree. This is not competent summary judgment evidence. And it's not, quite frankly, for a lot of reasons, statute of frauds being one of them. But only one of them. The district court also said for example, and this is on page 1050, Mr. Horn does not explain what quote, the agreement, close quote, is. So the district court clearly found other reasons to distrust this vague affidavit evidence. And especially in light of the fact that the undisputed record evidence showed that Ms. Wooten had conveyed her property. And not only had she conveyed it to Scogio via a warranty deed with no exceptions, reservations, or anything like that, Scogio then took it and conveyed it to Jeterra. And so you have to have a tripartite agreement between Jeterra and Scogio and Ms. Wooten that would somehow compensate somebody if liens were quote, substantially mitigated, whatever that means. Concerning the statute of frauds, is a statute of frauds an affirmative defense? Yes, it would be, Your Honor. The affirmative defense belongs to the party against whom a contract is being, you're seeking to enforce a contract. That's correct, Your Honor. Well, how can it be a basis for the district court to say I'm not going to consider this agreement? Because the district court is assessing the competency. But it has to be raised by a party to the contract. I'm not sure anyone can come in and assert the statute of frauds. Well, and I don't disagree with Your Honor on that point, but in the context that the district court was analyzing the evidence, the district court wasn't making a finding and saying if Ms. Wooten sues Mr. Maisel, saying give me my property back, Mr. Maisel is barred from, or Ms. Wooten is barred from that lawsuit because her contract is not in writing. That's not what the district court was saying. What the district court was saying was I need some evidence from you defendant because, or from you plaintiff because the defendants have come to me and shown me the evidence that shows I gave it away. Ms. Wooten gave her property away. No exceptions, no reservations. Where's the evidence that she retained any interest? And the only evidence is this affidavit that refers to an agreement that I think we all can agree would be unenforceable. And the district court said as an evidentiary matter, that's not enough. And so I'm not asserting it as a defense to any of their claims. I'm asserting it, and that's the only context in which I did assert it, as this evidence is not competent because it is a very vague description of an oral agreement to convey property that's disputed by the actual documentary evidence and also by the testimony of one of the parties purportedly to the agreement. If it's true that the law in Texas allows lenders to essentially unilaterally withdraw acceleration offers or acceleration triggers, is there any concern that this is kind of a potentially abusive strategy? Lenders can essentially get rid of the four year statute of limitations and never foreclose? Is that a concern? Interesting question, and I was talking about the certification issue and sort of getting into the policy issues that might surround this question of the lender's ability to abandon acceleration works to the borrower's favor, if you think about it, because that means the lender's not foreclosing despite the fact that they're still not getting paid. And I suppose you could probably come up with a scenario in which and I think it's probably true that a lender could in perpetuity issue letters under 16038, the day before the four years after acceleration, and they could do that forever. And my response would be, how is that? A, how is that a good business practice? And B, how would that be a problem for the borrower? Because that is a policy question. I appreciate the question, and it's a good discussion to have, but it's probably not for this case. All right. Thank you, Mr. Hanson. Thank you, Your Honors. I wanted to go to the issue, Judge Smith, you were talking about the potential nonreliance piece. What's important to acknowledge and understand is the type of mortgage this was. It was a home equity loan, which basically means it's a nonrecourse loan. No matter how indebted Ms. Wooten becomes, there will be no deficiency judgment. And that's what the bank agreed to. And there's a solution to that. And we all can say, well, you know, it shouldn't be good that someone squats in someone else's property and not pay. I get that. But the bank agreed to these terms, and there's a solution to that. The solution is foreclose, evict. And Judge Ho, you talked about what is this never-ending stream of five, ten years, and here we are almost eight years since they originally accelerated. Think about if they continue to just not, even though if a homeowner stays in the property, they benefit. But if they don't stay in the property, it's a detriment to them. Simply because if four years after they got into some trouble, they now have a foreclosure on their record, it's devastating from a credit standpoint. So there are detriments to all of this by the way that mortgage companies or loan services are doing all these things. You also indicated, and I thought it was important, was that when the offer was given nine, ten months later, the record reflects that she was in a one-year lease. Was she to break that lease to go back into her home? No. She had detrimentally relied upon what was going on and obligated herself for a one-year lease. This is in the record. In reference to the Bitterroot ruling, which is a 2016 ruling, it analyzed factually the issue of detrimental reliance and found that the only evidence of detrimental reliance that existed was the person moved out. The Bitterroot court basically refined and laid out that you've got to show the financial or legal consequence of moving out. And that's what we attempted to do. When we think back to the non-recourse loan, if Ms. Wooten had stayed in the home all these years, she was no more indebted. She would have been no more indebted than she was the day she moved out. Because it's a non-recourse loan. So when she moved out, she was in further detriment because she obligated herself for a lease agreement. So why that's important is because when you think about the detrimental reliance piece, when she moved out, she obligated herself for a one-year lease. She could have stayed in the house and not been any more indebted than she was when she moved out. But for the one-year lease, she would have taken the lower offer and moved back in? Well, I don't know if opposing counsel recited the record correctly. She can make her mortgage payment. In fact, when she moved into the lease, the lease payment was greater than her mortgage payment. But what they were asking But for the lease, the one-year commitment to the senior living facility, she would have taken the offer, moved back in, paid the Well, that's the thing, is that she wouldn't have been able to pay the $38,000. She didn't have the ability to do that. Then where's the detrimental reliance? Well, the detrimental reliance is that she could have stayed in the property and not incurred any more debt, not incurred the lease payment because it was a non-recourse loan. Oh, I see. You're saying it has nothing to do with the fact that she would have rejected the second offer, but she knows that they're not foreclosing any time soon, so just continue to squat. Well, when you think about detrimental reliance, it occurs at a point in time, and that point in time is when she moved out, not nine months later. Thank you. I think my time is up. Yes, your case is under submission. Thank you, Mr. Mazzello.